Good morning. May it please the court. Sonam Henderson for the appellant, James Damaso. I'm planning to reserve three minutes for rebuttal. I'll watch my clock. Okay, thank you. And I plan to start on the suppression issue, and if we have time, try to get over to Voidier as well. So the question for suppression in this case is whether the fact that Damaso emerged from the same general property that Baldonado went to with the package met the government's burden to show a particularized basis for suspecting Damaso, even though the officers did not know and did not try to find out how big the property was, how many residential units were on the property, or how many people lived there, and were officers similarly had no particularized information about Damaso doing anything suspicious before the stop, such as seeing him actually interact with Baldonado or even being in the same room or unit as Baldonado, or that Damaso was seen carrying something that could have come from the package, carrying a gun, or even doing something furtive. They don't have any of that. What did they have? Let's sort of work through this. They knew the package, the rigged-up package, had been taken into the residence and opened. Yes. They knew because they had stopped Baldonado, and you obviously don't challenge the traffic stop of Baldonado, that Baldonado said, Baldonado had the package but not all the fake meth that had been put in it. I'm not actually sure that they knew that, Your Honor. Well, they knew that he had one of the packages of meth, and there were originally four, were there not? They knew that at some point, at some point they knew that, whether they knew that before the stop. Well, no, not before the stop of Baldonado, before the stop of your client. Before the stop of Damaso. Okay. It was only five minutes in between. Okay, but here's what I think the record taken in the light most favorable to the government suggests, that they stop Baldonado, he says, he tells them a story, the story he tells them, and the story he tells them includes that he delivered the package to someone in the residence, and they can reasonably infer by looking at the package which is opened and what's there, that not all the meth is with Baldonado, or not all the fake meth is with Baldonado. And they know the package was opened in the building, in the residence. So they know all that stuff. They just don't know. It's not just that they know that somebody is leaving the building after Baldonado. They know that Baldonado has told them that he's delivered something to somebody in the building. Now, put all that together. Why isn't that? First of all, I disagree, and I've gone through the record in my reply brief with the sites about why they did not know those things yet, because there was only about five minutes in between the two stops. And they said they ate most of that time going back and forth just pulling Baldonado out of his car. It's the collective knowledge at the time. I understand, Your Honor, but there's still only one officer who could have that. All right, but your client had also been seen on the lawn before Baldonado was stopped, correct? They had no knowledge that that was the same person. Well, except then they have a show up out there before. What is it? Is it Cuyu, or what's the name? The Cuya? Cuya, and then someone takes a photo of your client, and then they show that to Baldonado, and he says, yeah, that's Cuyu. I'm sorry to interrupt, Your Honor. That's after they stop him. That can't be the cause. It can't be that they did the show up is the reason to stop DeMasso. They have to have reason to stop DeMasso. Okay, but it's a dead-end street, they claim. Sorry? All right, it's a dead-end street, and your client is the other person that drives out. And as Judge Hurwitz said, all the things that we have to infer in the government, and then pretty immediately, your client's reaching for something, and I guess then when they get him out, he keeps putting his hand in his pocket. Your Honor, that doesn't go to the stop. Again, we're talking about what the officers need before the stop. Let's focus again on the stuff that I talked about, because it seems to me that we have to, at this stage on appeal, assume that they got the information. See, you're arguing what you had argued below. The district court says there's probable cause to stop. They say there's reasonable suspicion to stop, but she makes no findings about No, the district court goes on to find that there's probable cause to stop. There's reasonable suspicion to stop, Your Honor. Your client never treats probable cause? Probable cause to search the car after the stop. Doesn't it also make an alternative finding of probable cause? I don't It does whatever it does. But it doesn't matter if there is probable cause, correct? Yeah, and I mean it's So add up those facts, because in finding reasonable See, here's where we're missing each other, so I want to be clear on it. In finding reasonable suspicion to stop, the district court found these predicate facts that I talked about before. It did not, Your Honor. It did. The district court says when they stopped him, they had reasonable suspicion to stop him because Baldonado had told them some things. Because he left. Not just because he left. Look at the district court's order. It recites those other things. You're arguing that he shouldn't have cited them because they occurred later, but the district court said they occurred. I will check that for rebuttal. I'm taking your question for now in terms of So let's say he said all this. Right. First, there's the uncertainty about whether he's telling the truth, right? So, like, Baldonado has plenty of reason to lie about handing this stuff off to somebody. He could just as easily have buried it there. There's no reason to believe him. It's not like he's some credible person. He's someone caught with a large amount of meth who's trying to get out of it. And then there's the uncertainty about how many units there are in the place, whether he could even have come out of the same unit, how many people there are in the place, whether he's met up with DeLosso or somebody else. But let me ask you this. If the district court I know that you argued that, I think, planting or things along those lines. If the district court had believed that the officers planted that, do you think the district court would have denied the motion to suppress? I think inherent to that, there's some credibility findings there. The district court didn't go for it. Again, Your Honor, we're talking about the stop. And there's no, all the stuff about planting, all of that is after the stop. We're talking about whether they had reasonable suspicion to stop him. When they saw the profile of the man walk out of the building, shortly after Baldonado left the building, did they have reasonable suspicion looking at that man Did they know that the package had been opened? They did know the package had been opened. Okay, so that's part of what they know. Because they put GPS in these, and then they put something. I don't know if it's the same. I'm not the most drug street person. I'm not saying that to be bragging. But they said they put some clue, something on it. Is that the same as searchee? Or is that different than searchee? So they wouldn't have seen any of that until after they stopped him. Sure, sure. But I'm still not clear what your argument is. I read your brief as arguing that there was no probable cause to stop. Now are you arguing there was no reasonable suspicion to stop? There was no reasonable suspicion. Is that what you're arguing in your brief? I believe so, Your Honor. Okay, so let's just, why, reasonable suspicion is a fairly low threshold. Yes. So just given, and I'm reading the district court's order, the district court's order isn't as precise as you might want it, but it says they stopped him, Baldonado. During the stop, they learned certain things. The district court doesn't rely on the photo array identification. And then says, then they stopped your client. And based on all the things that they knew, at that point they had reasonable suspicion to stop. So let's assume for a moment that they had reasonable suspicion. Do you then have an argument to suppress? No, my argument is that they didn't have reasonable suspicion. Okay, so see, I understood your argument to be that they didn't have probable cause to stop. They needed reasonable suspicion for the primary suspect. So your argument is that they, but assuming they did have reasonable suspicion, do you lose your motion to suppress? I believe so. But I don't think they had reasonable suspicion. And if I can just say that. Okay, no, I understand. I don't understand your argument because I thought your argument was they didn't have reasonable suspicion or they didn't have probable cause, and reasonable suspicion didn't give them enough of a reason to pat down your client and find the keys and do all those things. No, Your Honor, they did not have reasonable suspicion to stop because they have someone leaving a building. They don't know how many buildings there are. Didn't Inspector Tracy already feel like the residence was a single-family home? So he's saying that with I don't know what level of certainty, but it's not remotely credible because he also says right before that that there are two front doors. I've never seen a single-family residence with two front doors that are right next to each other. So you're arguing now that we here should assume that he wasn't. The court didn't credit the single-family home thing. So there's no factual finding about that. You don't have to go and find clear and convincing evidence. It didn't make a finding about that. The question is, did they think? And I would say even if he thought it, he must have had a lot of uncertainty about it because, again, if you're looking at a home and you see two front doors on it, that looks like a multi-family home. So if it was a single-family home, it's not. This is hypothetical. Okay. If it was a single-family home and exactly the same facts took place, would there be reasonable suspicion? I don't believe so because we don't know. So then you don't really care whether it's a multiple-family home. I do because I think it makes it even lower. See, I'm trying to figure out what the relevance of the multiple-family home is, and I think what you've just told me, it's irrelevant. I'm not saying it's irrelevant. I'm saying that I still don't think there would be reasonable suspicion. It is relevant in the sense that if there are three units there, then there's only a one-in-three chance that these guys came out of the same unit. Okay. So let's assume there is only a one-in-three chance for a moment. Right. Let's say, for example, that a person came out of the same unit to which a package of methamphetamine had just been delivered and opened. Is that not enough to give rise to reasonable suspicion, which, as I understand it from the case law, is a quite low threshold? Well, you've got to keep going with your probability. Well, no, see, it doesn't have to be more than a 50% chance for reasonable suspicion. I understand, Your Honor, but it's not just one-in-three that came out of the same unit. Because then he has to assume that each of these contained more than one person? There's no reason to assume otherwise. You have to at least take in your uncertainty about how many people are in each place. Here's my difficulty with your argument, and I want you to address it directly. Okay. I understand you're in a hurry to get everything in, so I'll try to do it quick. What you're saying is that officers who know that a package of methamphetamine has just been opened in an apartment and who have reason to believe that some of it is not in the car with Mr. Baldonado have to let everybody drive away from the building immediately thereafter without stopping them even to inquire. Yes? That's your position, isn't it? Your Honor, they could do what they usually do in cases like this. There are tons of cases like this. People are following around a hot potato package, and they don't ever just assume, well, someone was in there, so we can stop anyone who comes out of the place. They follow them around. So the answer to my question is they have to let him drive away and follow him. You don't have to let him drive away. You can follow him. What are they going to learn by following him? They could run his plates. They need the taillight to be out or they don't signal. Is that what you're saying? And then you would say that the officer wasn't following him back. That's what officers do all the time, yes. Then they have to make a pretext stop. I understand. But they can run the plates and see if that gives them some information. So they can actually just stop him and make believe that he crossed the center line, which is what they do all the time. You said it, not me. They testify to that. Now, I understand your position. I don't want to fight it. I'm just saying if you've got a one in three chance it's the same unit, guess there are four people in each unit. You've got to multiply those together. That's one in 12. One in two chance he's telling the truth about giving it to someone rather than just bearing it. Then you're at one in 24. Your numbers go down really quickly. I have very little time left. I just asked the court to look quickly at Vardir. There must be reasonably the trial judge has an independent responsibility to remove prospective jurors. Okay, but you had a chance. I don't know if it was you. Were you the trial judge? No. The trial lawyer? No. Okay. Well, whoever was the trial lawyer had a chance to ask questions, didn't ask any of those questions. The prosecutor was asking questions about experiences if they would disbelieve a law enforcement officer. And I noticed that you had two peremptory challenges left after you accepted the jury. Does a trial lawyer get to be a potted plant there? It's error by the trial. I mean, the trial lawyer should have done more, but it's also error by the district court, which, again, under Rosales-Lopez has an independent responsibility to remove prospective jurors who won't be able to impartially follow directions. But what's the showing of that? Vardir is the only way. What's the showing of that here? You could have asked questions if you thought something was wrong there. I mean, the trial lawyer should have asked, but this is whether the court also erred and the judge, too, should have asked. Is there any evidence that a juror was on the panel who was unable to follow instructions? No, Your Honor. And is there any evidence that there was a juror on the panel who was predisposed to believe police officers? We have nowhere to get such evidence. See, and that's the difficulty with clear error review. It seems to me that you've got some base. It's not your fault. You take the record as you get it. But we've got to have some basis for reversing a conviction. And when defense counsel at trial decides he doesn't want to have that question asked and therefore it's not asked, I'm not sure how we have a base. Are you going to say in every case in which defense counsel doesn't? It must be given in every case is what you're saying. Under this Court's case law. No, our case doesn't. Our case law doesn't say a judge clearly errors in every case by not asking this question. No, it doesn't say clearly errors, but your case law says that in every case where law enforcement testimony is important, you have to ask the question. If requested is not part of the language of every case. If you look at contrast astro. Do you have a case that stands for the proposition that it is clear error when a law enforcement Let me finish. You're over time anyway, so you're not losing any of your time. Fair enough, Your Honor. Do you have a case for the proposition that it is clear error when law enforcement personnel testify at trial? Or a trial judge. Plain error? Yeah, or plain error. I come from state court where it's clear error, but plain error. Plain error not to ask that question if absent a request from defense counsel. So contrast astro sets out the principle without saying. I understand what contrast. I'm asking you, do you have a case that says that? The answer is no, I think. I understand. You're asking is there a previous plain error case? You're reasoning from other cases. I understand your reasoning. I'm now asking a very specific question. Don't answer it before I finish it. Do you have a case that says that? I don't have it. Okay, that's all I wanted to know. I don't have it and I don't need it. I can't control either of you here. I apologize, Your Honor. So I'm going to give you ‑‑ we've taken you over time, but I'm going to give you two minutes for rebuttal. Okay, thank you. Thank you so much. Okay, good luck. Good morning. Ben Petersburg on behalf of the United States. May it please the Court. We ask the Court to affirm the judgment below in its entirety because the stop of DeMoss' vehicle was supported by reasonable suspicion. The voir dire was reasonably sufficient to ensure an impartial jury and to provide the parties with enough information. Let me clarify here on that. My understanding is the Court allowed both sides to ask questions if they wanted to. Yes, that's correct, Your Honor. All right. I was a trial judge, so when lawyers don't ask certain questions, I always had a certain reluctance to, you know, because I also was a trial lawyer, and, you know, there's a feeling like, Your Honor, if you're going to try my case, please don't lose it for me. So apparently what your friend on the other side says is that the Court should have affirmatively balanced out maybe what the prosecutor was asking at the time. Are you familiar with any cases on that? I am not. I couldn't find any case that reversed for the failure to ask this sort of law enforcement bias question without a request. So what were the questions about law enforcement that were asked? They were asked mostly by the government during the voir dire. They asked, first of all, whether any of the potential jurors were acquainted or knew any of the witnesses, which included mostly agents. And some jurors did answer in the affirmative, and there were some follow-up questions about how you would handle their testimony, if you could vote to acquit, if you did not believe the law enforcement testimony. The Court also did ask a question in voir dire. It was sort of a more general question about whether anyone on the panel, if there was any reason why they could not be fair or impartial in the case, and that's at 8 ER 1522. But I think this absence of the request from the parties is telling here, especially in the plain error context. It was not clear and obvious that this was necessary, that this was needed in order to have an impartial jury, in order for these parties to exercise their peremptories and their challenges for cause. Can we go back to the traffic stop? Sure. I just want to make sure that I understand the facts correctly, and I've reread the district court's order, and it's not entirely specific about when things occurred during the stop. So what did the officers know at the moment that they stopped DeMasso? I mean, I know what they knew about the package. They knew that the package had gone into the building, had had been opened, and had stopped Baldonado. Tell me what additional facts they knew from the stop of Baldonado at the time that they stopped DeMasso. A couple of the agents testified in general in these package delivery cases that there's, in their experience, there's an expectation that the person transporting the package is going to deliver it to another person. You know, Jeffrey Baldonado's name was on the package, and usually the people who are receiving drugs in the mail don't put their own names on it. So there was an expectation by the agents that there would be at least another person involved. Did they say that? Yes. So we want to know what the testimony was. Sure. That's at 6 ER 1230 and 1335. They knew the normal course was to deliver it to someone else. Yes, and so there was an expectation at the time that there was likely to be another person involved. Why did they go to that location? They had no reason to know that that location— well, they went there because that's where Baldonado took the package eventually. That was not the address on the package. Does it have to do with the GPS? Is that why they knew that— Yes, I'm sorry. Tell us what the officers knew, why they were there, before they stopped Dimapa. Sure. So they had intercepted this package addressed to Baldonado. It contained about 1,800 grams of methamphetamine. They replaced the methamphetamine with sham, four pouches. They wired it up with a GPS tracking device so they could see where it went, and a breacher, which would emit a radio signal as soon as it was exposed to light. So they would know almost immediately as soon as that package was opened. And they stopped Baldonado coming out. They did, after the breacher had alerted— Okay, now, this is where your friend is focusing, so I just want to— Sure. And then at some subsequent point, they stopped Dimapa. Yes, within, I think, a few minutes. Within a few minutes. What did they learn that they didn't know before— you've told me what they knew before—in those few minutes? Well, just before that, Inspector Tracy had driven up to the front of this residence. He described it in his testimony as a single-family residence, a one-story concrete structure. There is a photo in the record at 5 ER 1001. It's not a complete photo of the structure, unfortunately, but it does show a single-story concrete structure of modest size that is consistent with the idea that this could be a single-family residence. And, Inspector Tracy, that was his testimony. He had a good faith, reasonable belief this was a single-family home. We also know as soon as Baldonado was pulled over by Inspector Tracy, who— Did Tracy say before Baldonado had stopped that there's another guy standing out front or that there's people out front? Well, he testified that he saw a person later identified as James DeMasso standing out front of that structure. So all he knows, but he didn't know it was DeMasso? Not at that point. When he stopped DeMasso. But does he tell the officers that initiated the stop on Baldonado that there was someone else out front? I don't know if there's testimony to that in the record, Your Honor. I don't think so. There is testimony that it was Homeland Security and the postal inspectors working together. There were about a dozen agents set up in various— Yeah, and we can use that collective knowledge, I think. And I'm still— It's not your fault, it's ours. We keep distracting you. Tell me what they learned after they stopped Baldonado before they stopped DeMasso. Inspector Tracy is partnered up with Erwin Fajaran. He's a Homeland Security task force officer. They stopped Baldonado at the first cross street off of Chalendigas. And there's testimony that they pulled Baldonado out of the car pretty quickly. And Agent Fajaran testifies at 3 ER 505 that immediately he does a cursory check of the car. Inspector Tracy grabs Baldonado. He does a cursory check of the vehicle. He sees the Baldonado package sitting on the front seat. Why did they pull him out of the car? Did they say he was, like, rambling around? I think there's actually testimony that he got out of it, that he opened the door and stepped outside the car. So they see this package. Erwin Fajaran, he sees the package. He says he does a cursory check. He opens it. And he sees there's one package of sham. Okay. So does the record establish that he did that before DeMaso was stopped? Yes, Your Honor. He says he does it almost immediately after Baldonado. All right. So that's one thing that occurs. What else occurs before DeMaso is stopped? Well, it's subject to some dispute. Taking the record into light most favorable to the government and then to test based on the record. I'm not going to make up facts. Yes, Your Honor. Within a couple of minutes, Baldonado is put into the back seat of Inspector Tracy's government pickup truck, and he's Mirandized and starts making statements. And he says, I brought this package to give to someone he called Kuya. Okay. Do we know whether or not DeMaso's car is stopped before that or after that? I think it's after. And there is some testimony from – Tell me what testimony supports it. There's some testimony from Inspector Tracy that – and I have it in my notes, and I'm sorry. While he was interviewing Baldonado about Kuya, he saw the investigator stop the other car, which ended up being DeMaso. So while he was interviewing him about Kuya, and the Kuya reference had been that I delivered it to? Yes. My Kuya. That's a 2ER270. That's Inspector Tracy's testimony. All right. So what else did they know before they stopped DeMaso? That they learned after stopping Baldonado. I know they knew lots of other things. He said a lot more later, I think. But he says, I gave it to Baldonado. Baldonado says DeMaso opened the package. We can infer that he saw the tracking devices inside of it and panicked. Baldonado says DeMaso gave him back the package and told him to get rid of it. Does he say that to the officers before they stopped DeMaso or after they stopped DeMaso? I think it would be hard to pinpoint that exactly. The only testimony we have from Tracy that I could find said he saw them stopping DeMaso, the other agents, while he was talking to Baldonado about Kuya. Okay, so let me try to make your friend's argument for it. Maybe he'll discount it. He'll disavow it when he stands up. He says, all you know at this point is that a package has gone into a house, let's assume single-family residence because he says it doesn't make any difference, where there may be more than one person inside, and you've stopped this guy who has not the entire contents of the package, and he says he's delivered it to his brother. Let's assume those are the only facts you know at that point. Does that give your eyes the reasonable suspicion to stop the next person who comes out of the house? I think it does. I think there's a logical connection between DeMaso now and the suspected criminal activity. Just because he's left the house? Shortly after this package was opened. Shortly after it was opened. Yes, Your Honor. And knowing that Officer Feheran had seen there was sham that was still missing. There were still three packages of sham outstanding. He saw one inside the package. Right. He knows that Baldonado doesn't have all the contents of the package, and he knows that before DeMaso leaves the house. Yes, Your Honor. I think that's a reasonable suspicion based on the totality of the circumstances. Well, wasn't there also some, I don't want to do your job for you, but wasn't there also some testimony about there's one way in and one way out? So it wasn't a situation where someone could just be innocently. There was a strong inference, I guess, that that person had come from the house. Yes, Your Honor. I think there's clear testimony on that point, that it is a dead-end road, one way in, one way out. There's testimony that other agents who were conducting surveillance radioed at around 10.15, indicating they'd seen another male leave the residence in a silver or gray SUV, and that was the SUV that DeMaso was driving. We have testimony from Erfel Matan Guihan. He is a HSI special agent, and he testifies that he heard that radio chatter, that they saw the SUV coming down the road, and that's the SUV that they stopped. So I don't think there's any indication that they pulled over the wrong car. I take it your friend isn't really arguing the car didn't come out of the house. His argument is they don't know that the person in the car had anything to do with the crime. Right. And we're dealing with reasonable suspicion. The agents are not required to eliminate all possible innocent explanations for a person's conduct before conducting this brief investigatory stop. I know you made an inevitable discovery argument at the district court. I think you did. Am I right? I would have to go back to the record and double-check, Your Honor. I'm sorry I wasn't. Okay. Well, I'm interested in this. We know that at some point, and let's assume the photo identification is okay, and that's a contested issue in this case, but let's assume the photo identification is okay. At that point, having—well, I guess his argument is it all arises from the illegal stop. Is there any argument that they would have been able to stop Damaso at some later point anyway? I mean, I think we would have to speculate a little bit about whether they would have been able to do that. Okay. And so the fact that he has anything on his hands doesn't really have anything to do with— Not for purposes of the traffic stop. Not for purposes of the traffic stop. Out of the vehicle. Okay. Yes, Your Honor. So we would ask the court to affirm the district court's denial. Did you understand your friend's argument to be that there wasn't probable cause or that— In his opening argument, he said, I'm just arguing reasonable suspicion, and if there's reasonable suspicion, if this court finds hypothetically that there was reasonable suspicion, then he concedes that he loses, that the rest falls into place. Was that what you understood his argument to be in the brief? Yes, Your Honor. My understanding was that the challenge was to— Just the reasonable suspicion. It's probably my mistake for trying then to figure out whether there was probable cause. So that's the only dispute. If there's not reasonable suspicion, you lose. Correct. And if there is reasonable suspicion, you win. Yes, Your Honor. That's the way I understand it. Okay. Any additional questions? We don't have any additional questions. You're free to use the balance of your time, or you can— I have just a little bit of time remaining, but if the court doesn't have any questions, I will just repeat that we do ask that the court affirm the judgment below in its entirety. Thank you very much. Thank you. Thank you, Your Honors. I'm going to try to move quickly here. I've heard a couple arguments about, in terms of Wadhir, just really quickly, government saying that on plain error it seems relevant that they didn't ask. The whole point of plain error is that they didn't ask. He wouldn't be on plain error if he'd asked. And what the government is trying to do is backdoor argue waiver, like an intentional relinquishment of a known right. And there is no proof of that. The government did not put on any proof of that. That would be their burden. They didn't do it. So you can't just assume, well, he meant to not do it. That is waiver. They haven't made that showing at all. They haven't even made that argument. In terms of suppression, Your Honor, your question—I'm sorry, Judge Hurwitz, your question about what the order said. The order talks about an ER 7576. It says what the officers learned during the stop of Baldonado— the order is not specific about when they learned it. So it's not— Tell me what the record— There's no finding that there was. And then the record is, well, first of all, this idea that there's an expectation that it would be broken up at 1230. I urge you to look at ER 1230, 1232. There's no expectation. He says sometimes it happens. It could happen. It's not that kind of force that the government is describing it as. And—sorry. In terms of what they knew, just getting back to the single-family home, I also ask you to look at that picture that the government referred to at ER 1001. That is half a house or less than half a house. It's some portion of a house. You can't look at that and say, oh, well, that's definitely a single-family house because it only shows a part of the structure very clearly. In terms of the front gate, that's the front gate to the property. There's one way in and out of the larger property, but we know there are at least two exterior doors on the front and another exterior door in the rear. And just in terms of people leaving, it's not such a late hour to make— Remember, they stop two other cars right after this. This isn't like a laser-focused thing. They're stopping everyone in sight. It's really a checkpoint, which is not allowed. And they stop two other cars right afterwards. So there are at least three people abroad on this supposedly isolated world dead-end street at this hour, and two of them we know had nothing to do with this. And actually, Mr. DeMasso, they didn't find what they thought they were going to find on him. So they didn't find anything from the package on him. So they're kind of taking a scattershot approach. I'm not sure you can use that because if they'd found it, I wouldn't let them use it. Well, no, no, but I mean they didn't— I'm just saying that this is a scattershot approach they're taking. This isn't, you know, oh, there could only be one person here. There's no reason to assume only two people lived on the property. It's just as likely that 20 people lived on the property. It was the government's burden, and that's just the last point. This is the NOVA review. I don't know that you look at this in the light most favorable of the government. This isn't a Rule 29 motion. No, well, we don't retry the facts. Sorry? We don't retry the facts. You would review the court's factual findings for clear error. As I say, on ER 7576, there are no factual findings about these things, about the particular sequence in which you learned them. And then you're not taking the evidence in the light most favorable of the government after that. You are looking at it anew. It is the NOVA review. All right. We've given you extra time. I so appreciate it. Thank you very much. All right. Thank you both for your arguments. This matter will stand submitted.
judges: CALLAHAN, HURWITZ, THOMAS